**THIS OPINION
IS A PRECEDENT OF
THE TTAB**

Hearing: January 20, 2011     Mailed: September 30, 2011


UNITED STATES PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

UMG Recordings, Inc.
v.
Mattel, Inc.
_____

Opposition No. 91176791
to Application No. 78751105
filed on November 10, 2005
_____

Russell J. Frackman and Alexa L. Lewis of Mitchell
Silberberg & Knupp for UMG Recordings, Inc.

Lawrence Y. Iser and Chad R. Fitzgerald of Kinsella Weitzman
Iser Kump & Aldisert for Mattel, Inc.
_____

Before Walters, Cataldo and Bergsman, Administrative
Trademark Judges.

Opinion by Walters, Administrative Trademark Judge:

   UMG Recordings, Inc. filed its opposition to the

application on the Principal Register of Mattel, Inc. to

register the standard character mark MOTOWN METAL for "toys,

games and playthings, namely, toy vehicles and accessories therefor," in International Class 28.[1]

As grounds for opposition, opposer asserts, in its amended notice of opposition, that applicant's mark, when applied to applicant's goods, so resembles opposer's previously used and registered MOTOWN marks, shown below, as to be likely to cause confusion, under Section 2(d) of the Trademark Act.[2]

| Registration | Mark | Goods/Services |
|---|---|---|
| 1075409 Registered 10/18/77; Section 15 declaration acknowledged; Renewed | | "Records, tapes, cassettes, cartridges and audio video reproducing devices in the form of tapes, cassettes, disks and cartridges," in International Class 9. |
| 2767101 Registered 9/23/03; Sections 8 & 15 declarations accepted and acknowledged respectively | MOTOWN | "Restaurant services," in International Class 42. |
| 0881471 Registered 11/25/69; | MOTOWN | "Providing popular musical entertainment," |

---

[1] Application Serial No. 78751105, filed November 10, 2005, based upon an allegation of a bona fide intention to use the mark in commerce in connection with the identified goods.

[2] Opposer established its ownership and current status of these registrations during trial. Opposer also asserted ownership of several pending applications. If registrations issued from the pleaded applications during trial, opposer did not submit copies of the registrations. Therefore, these applications are evidence only of the fact of their filing. (Serial Nos. 78617356, 78617352, 78614904, and 78614895.) Additionally, opposer asserted ownership of Registration No. 2663608, which has been cancelled and is evidence only of the fact that it previously existed. Thus, this additional registration and the applications are of no probative value.

| | | |
|---|---|---|
| Section 15 declaration acknowledged; Renewed | | in International Class 42. |
| 0985976 Registered 6/11/74; Section 15 declaration acknowledged; Renewed | | "Phonograph records, tapes and cassettes," in International Class 9. Disclaimer: drawing of map. Color Statement: "The drawing is lined for the colors red, yellow and blue and color is claimed as a feature of the mark." |
| 0985972 Registered 6/11/74; Section 15 declaration acknowledged; Renewed | | "Phonograph records, tapes and cassettes," in International Class 9. Color Statement: "The drawing is lined for the colors red, yellow and blue and color is claimed as a feature of the mark." |
| 2516930 Registered 12/11/01; Sections 8 & 15 declarations accepted and acknowledged respectively | | "Musical sound recordings," in International Class 9. Disclaimer: SERIES |
| 3073897 Registered 3/28/2006 Sections 8 & 15 declarations accepted & acknowledged, respectively | MOTOWN MUSIC REVIEW | "Retail gift store featuring music, clothing, reading materials and souvenirs," in International Class 35. Disclaimer: MUSIC |

Also as a basis for its Section 2(d) claim, opposer asserts prior use of the word mark MOTOWN and the design

3

mark shown below in connection with "toys, games and playthings, namely, board games [and] karaoke."



Finally, opposer has asserted a claim of dilution by blurring.[3]

Applicant, in its answer to the amended notice of opposition, denied the salient allegations of opposer's claims. Applicant has asserted several affirmative defenses that are primarily amplifications of its denials and are not repeated herein. However, applicant also asserted affirmatively that: (1) MOTOWN is merely a nickname for Detroit, Michigan, as such it is "a generic geographic description" and entitled to "extremely limited protection" (Ans. Para. 22), and applicant uses the term MOTOWN only in connection with METAL; (2) applicant uses its mark in connection with its "well-known" (Ans. Para. 15) HOT WHEELS mark, which precludes any likelihood of confusion or dilution; (3) opposer is exclusively a recording company and

---

[3] While opposer did not properly plead the fame of its mark(s) *prior to the earliest date on which applicant can rely for purposes of priority,* because applicant did not move to strike the dilution claim for failure to state a claim and, in its brief, treated the dilution claim as if it were properly pleaded, we deem the dilution claim to have been amended by implied consent of the parties. See Fed. R. Civ. P. 15(b). In other words, we deem the dilution claim to allege that opposer's "Motown Marks" became famous prior to applicant's use of the mark MOTOWN METAL.

has never used in commerce or registered the marks MOTOWN and/or MOTOWN and design for goods in International Class 28; (4) opposer has never manufactured or sold toys, games and playthings, particularly toy vehicles and accessories therefore, under these marks; and (5) to the extent opposer made any use of these marks in connection with toys, games and playthings, such use does not predate applicant's use of its MOTOWN METAL mark.[4]

*Applicant's Counterclaim to Cancel/Partially Cancel*

With its Answer, applicant filed its "counterclaim to cancel and/or limit UMG's registrations to the extent they apply to toys, games and playthings."  In particular, applicant repeats its assertions noted above regarding opposer's alleged lack of use or registration of its MOTOWN and/or MOTOWN and design marks for the noted goods in International Class 28 and contends that, only if a likelihood of confusion exists, such confusion will be avoided if "UMG's registrations for the marks MOTOWN and/or MOTOWN and design in International Class 28 (if any) [are] partially cancelled and/or limited to exclude application to toys, games and playthings, namely, toy vehicles and accessories therefor."

---

[4] Applicant also asserts unclean hands and bad faith, although it provides no basis for these assertions, nor did it pursue these defenses at trial.  These defenses have been given no consideration.

Opposer, in its answer to the counterclaim, denies the salient allegations, except that regarding applicant's paragraph 28, opposer admits that it "does not have a valid registration for the marks MOTOWN and/or MOTOWN and design in International Class 28, [and it] has not filed an intent to use application for such marks in Class 28." (Counterclaim Ans. Para. 7.)

Opposer denies that a likelihood of confusion would be avoided by the entry of any limitation and/or restriction to its identifications of goods and/or services in its MOTOWN and MOTOWN and design mark registrations; and that applicant's counterclaim is without foundation in law or fact.

Opposer asserts, as an affirmative defense, that "to the extent Mattel ever possessed any enforceable trademark rights in MOTOWN METAL, which UMG denies, Mattel has abandoned such rights." (Counterclaim Ans. Para. 14.)

We find it appropriate at this point to discuss the parameters and viability of applicant's counterclaim. First, in its petition to cancel, applicant did not identify any particular registration(s)[5] owned by opposer to which its counterclaim applies. Applicant filed its answer and counterclaim electronically and, in its ESTTA filing form,

---

[5] Applicant paid a fee that is sufficient to petition to cancel two registrations, but at no time amended its petition to add another registration.

6

applicant specified only one of opposer's pleaded registrations, No. 3073897. Because the Board considers the ESTTA filing form and the attachment thereto, *i.e.*, the statement of grounds for the petition to cancel, to comprise a single document, we find that the petition to cancel pertains to opposer's Registration No. 3073897, but only to that registration. *See Schott AG v. Scott*, 88 USPQ2d 1862, 1863 n.3 (TTAB 2008); and *PPG Industries Inc. v. Guardian Industries Corp*., 73 USPQ2d 1926, 1928 (TTAB 2005).

Second, the language of applicant's counterclaim seeks a restriction to the identification of goods/services in all of opposer's registrations, pending applications and, by implication, to its future applications. The scope of applicant's request is more in the nature of a request for an injunction. However, applicant is reminded that the jurisdiction of the Board is limited to trademark registrability and a proceeding before the Board pertains only to the registration(s) or application(s) specified in the pleading, in this case, Registration No. 3073897.

Registration No. 3073897 is for the word mark MOTOWN MUSIC REVIEW for "retail gift store featuring music, clothing, reading materials and souvenirs," in International Class 35. Applicant requests that opposer's registration(s) in International Class 28 be limited to exclude "toys, games

7

and playthings, namely, toy vehicles and accessories therefore." Opposer admits that it owns no registration for any goods in International Class 28 and, in particular, the registration that is the subject of applicant's counterclaim for partial cancellation does not contain any goods in International Class 28. Thus, applicant's counterclaim cannot succeed because the requested relief is irrelevant to this registration. It is unnecessary to consider the parties' arguments regarding the substantive merits of applicant's claim. Applicant's counterclaim is denied and will be given no further consideration.[6]

### The Record

The record consists of the pleadings and the file of the involved application as a matter of rule. Additionally, both parties filed briefs on the case.

The parties stipulated to the submission of testimony via declarations; to the submission by notice of reliance of opposer's evidentiary record in the case of *UMG Recordings, Inc. v. Charles O'Rourke*, 92 USPQ2d 1042 (TTAB 2009)("O'Rourke case"); and to the submission of information and documents provided by either party during discovery.

Both parties submitted a substantial amount of evidence, much more than was necessary to support their

---

[6] Opposer's allegation of abandonment is made only as an affirmative defense to the counterclaim. In view of the Board's denial of the

respective positions.  For example, applicant submitted approximately 900 pages of printed publications to support its contention of current third-party use of Motown to refer to Detroit, Michigan.  The better practice would have been to submit a representative sample of such articles, describing in a witness declaration the extent to which the sample is representative.  Similarly, for example, in addition to declarations detailing its past recording history, opposer submitted many documents evidencing such history, although the facts detailed in the declarations could have been supported with significantly fewer documents, particularly in view of the fact that, for the most part, applicant does not contest opposer's history as a recording company.  Both parties submitted responses to *all* posed interrogatories, regardless of relevance to issues to be decided herein.  Each party also submitted the discovery depositions, in their entireties, of the other party's trial declarants, rather than merely those statements necessary to explain or rebut declaration statements.  Moreover, both parties improperly designated whole documents as confidential, including large amounts of non-confidential information.  Indeed, any efficiency realized by the parties' above-noted evidentiary stipulations was defeated by their submission of excessive records pursuant thereto.

---

counterclaim, opposer's allegation of abandonment has been given no

The Board reviews each and every document and all testimony submitted in any proceeding.  Overly large records such as this one tax the limited resources of the Board and are entirely unnecessary.  Moreover, the better practice for a party before the Board would be to focus on supporting, only to the extent required by the pertinent burden of proof, the main facts to be established; rather than forcing the Board to sift through reams of documents and testimony to find the evidence specifically relevant and necessary to establish a party's position.

In support of its position, evidence submitted by **opposer** includes the following:

- From the *O'Rourke* case:
    1. Copies of applications and registrations;
    2. Trial declaration of Laura Froeling, senior vice president, business affairs, for Universal Music Enterprises ("UME"), an unincorporated division of opposer, with exhibits;
    3. Trial declaration of Mario Ortiz, paralegal for opposer's counsel, with exhibits; and
    4. Trial declaration of Michael Reinert, executive vice president, business and legal affairs, for Universal Motown Records Group ("UMRG"), an unincorporated division of opposer, with exhibits.

---

consideration.

- Copies of opposer's previously noted U.S. trademark registrations and applications;

- Discovery depositions, with exhibits, of applicant's trial witnesses Jan Heininger, Raymond Adler and Christopher Bouman;

- Trial declarations, with exhibits, of the following persons:

  1. William Waddell, vice president of business affairs for UME;

  2. Gary Atkinson, general counsel for the Singing Machine, Inc., licensee of opposer's Motown trademarks in connection with karaoke products;

  3. Deanna Czapla, retail operations manager and buyer for Delaware North Companies Travel Hospitality Services, Inc., licensee of opposer's Motown trademarks;

  4. William Schulte, vice president of Late for the Sky Productions Co., Inc., licensee of opposer's Motown trademarks;

  5. Melissa K. Cote, paralegal for Hasbro, Inc., licensee of opposer's Motown trademarks;

  6. Michael Rajna, associate director of licensing, Konami Digital Entertainment, Inc., licensee of opposer's Motown trademarks in connection with the videogame Karaoke Revolution;

7. Anton Handal, chief executive officer of the Singing Machine, Inc., licensee of opposer's Motown trademarks in connection with karaoke products;

8. Jerry Juste, senior vice president, business and legal affairs, for UMRG.

Opposer's rebuttal evidence:

- Dictionary definition, newspaper articles, and a book excerpt, all referring to "Motown";

- The rebuttal trial declaration of Peter Caparis, founder of The Caparis Group LLC, a sales and marketing consulting firm; and

- Copy of the Board's final decision in *O'Rourke*; and a copy of a decision from the 9th Circuit.

Additionally, opposer has requested that the Board take judicial notice of website evidence, which we decline to do, as discussed below; and of a definition of "Barbie." We do take judicial notice of the definition of "Barbie" as "1. *Trademark*. A brand of doll representing a slim, shapely young woman, especially one with blond hair, blue eyes, and fair skin. 2. *Noun*. … a person, especially a young woman, perceived as blandly attractive and vacuous." (*Dictionary.Com Unabridged*, from *Random House Dictionary* at www.dictionary.reference.com.)  We note, however, that this definition is of no probative value herein.

12

In support of its position, evidence submitted by **applicant** includes the following:

- Trial declarations, with exhibits, of the following persons:

    1. Jan Heininger, copywriter for applicant, creator of copy for packaging for Motown Metal Hot Wheels die-cast toy cars;

    2. Christopher Bouman, applicant's senior marketing manager, Hot Wheels Adult/Collector Division;

    3. Raymond Adler, applicant's marketing manager, games and puzzles, and, from 2004-2008, for applicant's Hot Wheels Marketing Group; and

    4. Lawrence Ferrara, PhD, musicologist and professor of music and director of music and performing arts at New York University;

- Discovery depositions of opposer's trial witness William Waddell, and opposer's discovery witness Jeffrey Moskow, vice president for marketing for UME;

- Opposer's responses to applicant's interrogatories and requests for admission;

- Copies of documents produced by applicant during discovery;

- Brochures and promotional materials for applicant's goods; and

- Printed publications in the nature of articles from newspapers and periodicals, excerpts from books and websites, and definitions of "Motown"; and

- Copies of third-party registrations.

*Objections to Evidence*

Both parties have submitted evidentiary objections, which we consider now. In stipulating to submission of testimony by declaration, the parties agreed that the declarations are "subject to the right of the party against whom the evidence is introduced to object to such evidence on any applicable ground, including but not limited to competency, relevance, and materiality, and further subject to the parties' right to cross-examine declarants by live deposition." (Parties' Stipulation to Submission of Testimony and Evidence, p. 2, para. 1.) Additionally, the parties agreed to opposer's submission herein of evidence it filed in unrelated Opposition No. 91178937 (*UMG Recordings, Inc. v. O'Rourke*), "subject to applicant's right to object to such evidence on any applicable ground …." (Id., p. 2, para. 3.)

The Board encourages parties to, whenever appropriate, streamline their Board proceedings. This includes the submission of declarations instead of transcripts of live depositions, which usually conserves costs and resources for both the parties and the Board. However, in this case, the

parties essentially subverted this process by agreeing to the noted stipulation and then submitting numerous objections to the declarations, in some instances in their entireties.

Opposer submitted its 25 pages of objections as an appendix to its brief. Opposer objects to applicant's Exhibit Nos. 1-11, third-party registrations submitted via applicant's June 16, 2009, notice of reliance, contending that this is not evidence of use of the respective marks. This objection is overruled. There is no question that registrations are not evidence of use of the registered marks and are of limited probative value; however, this is not a basis for excluding this evidence from consideration for whatever probative value it may have.

Opposer also objects to several statements made in the declarations of applicant's trial witnesses, Heininger, Adler, and Bouman.[7] The asserted bases for the objections to specific statements vary, although the bases include lack of relevance, lack of foundation or personal knowledge, improper legal conclusions, hearsay, vague and ambiguous statements, and that witness statements are violations of the Best Evidence Rule. We have considered each of opposer's individual objections regarding statements by witnesses Heininger, Adler, and Bouman. We find that

---

[7] We address objections to the Ferrara declaration separately infra.

opposer's objections are not well taken and the objections are overruled.  We do not burden this opinion by addressing each objection individually herein.  However, we note as examples, and respond to, a few of opposer's specific objections below:

- Opposer objects to Mr. Heininger's statement describing applicant's "general process for naming products" on the grounds that it is not relevant and violates the Best Evidence Rule.  However, the statement is certainly relevant to applicant's process and intent in choosing the subject mark.  Moreover, Mr. Heininger's statement is based on his personal knowledge and he makes no reference to a document in evidence that would speak for itself on this point, opposer does not identify such a document or suggest that one exists, and opposer does not explain why documentary evidence would be necessary to prove the statements made.

- Opposer objects to Mr. Heininger's statement describing how he "came up with the name 'Motown Metal" for this line of HOT WHEELS toy cars" on the grounds that it is not relevant, it violates the Best Evidence Rule, and it is the opinion testimony of a lay witness.  For the reasons stated above, the first two noted grounds are not well taken.  Regarding the third ground, Mr. Heininger's statement recounts his own thought process

16

and the basis of his thinking (regardless of whether the asserted facts underlying his reasoning are accurate) – the statement is neither an opinion, nor is it matter about which he is not qualified to testify.

- Opposer objects to Mr. Heininger's following statement on the grounds that it is not relevant, the witness lacks personal knowledge, and it is hearsay:

> In approximately the fall of 2005, Mattel's marketing department assigned me the task of creating a name for a series of HOT WHEELS die-cast toy cars modeled on famous American "muscle cars" produced by the "Big Three" Detroit automakers (i.e., General Motors, Ford, and Chrysler) in the late 1960's and early 1970's. The term "muscle car" refers to a fast, high-performance, "hot rod" type car with a large, powerful engine. Classic Detroit muscle cars include the Chevrolet Camaro, the Pontiac GTO, and the Plymouth Road Runner.

The nature of the product for which Mr. Heininger had been tasked with creating a trademark is clearly relevant. There is no indication that the factual statements about the cars are not based on the witness's personal knowledge and opposer has provided no basis for doubt in this regard. Moreover, although his statement could have been worded to avoid any allegation of hearsay, Mr. Heininger is recounting from his own experience the nature of his assignment. We do not find the statement about the nature of "muscle cars" to be hearsay, i.e., a statement offered in evidence to prove the truth of the matter asserted (Fed. R. Evid. 801(c));

17

rather, we have considered the statement as indicating Mr. Heininger's understanding of the nature of the product for which he is creating a mark.

Finally, we consider, in particular, opposer's objections to the opinions and statements of Mr. Ferrara, a musicologist. While applicant does not specifically refer to Mr. Ferrara as its expert, the declaration is clearly so intended, opposer acknowledges Mr. Ferrara as applicant's expert (Brief, p. 2), and opposer does not challenge Mr. Ferrara's expertise as a musicologist.[8] Except for paragraph 1 of the declaration, opposer has objected to the remaining paragraphs (nos. 2-16) in the declaration. Each objection is based, in part, on opposer's assertion of lack of relevance and that the statements are vague and ambiguous. The statements all pertain to the significance of the term "Motown" and, as such, are very relevant herein. Opposer has not explained why it believes Mr. Ferrara's statements are vague and ambiguous and we find this objection is without merit throughout. Therefore, opposer's objections to Mr. Ferrara's declaration on these grounds are overruled.

We now turn to opposer's objections on other grounds. In paragraphs 2, 3 and 16, Mr. Ferrara states his opinion

---

[8] However, in its brief, opposer does question the probative value of expert testimony from a musicologist, claiming that its own expert, Mr. Caparis, a marketing professional, is probative.

18

that, inter alia, "the term 'Motown' refers both to a record company and more broadly is used as a descriptive term for a musical style or genre that extends beyond the Motown record company" (para. 2) and he states the basis for his opinion (para. 3). Opposer contends that the witness lacks personal knowledge. Mr. Ferrara states clearly that his statements in these paragraphs are his opinion based on his "musicological research," which he details, at least in part, in the intervening paragraphs. Moreover, Fed. R. Evid. 703 permits an expert to give an opinion based on matters not in evidence. Opposer's objection is without merit and is overruled.

In paragraphs 4-15, Mr. Ferrara details excerpts from attached exhibits B through N that informed his opinion that the term "Motown" is used in each excerpt to identify "a musical style or genre." Opposer objects on the grounds that the statements violate the Best Evidence Rule, citing Fed. R. Evid. 1002. However, applicant is not seeking to prove the contents of the writings through the quotes from the documents in Mr. Ferrara's declaration. See Fed. R. Evid. 1002, Notes of Advisory Committee on Rules. Rather, Mr. Ferrara is merely directing attention to portions of the documents, which are properly of record as exhibits to the declaration, that he believes support his expressed opinion.

Moreover, we view Mr. Ferrara's statements as based on the fact of the appearance of the term "Motown" in the context in which it appears in the writings, not for the underlying truth of the statements in those writings upon which he relies. Opposer's objections on the ground that the paragraphs violate the Best Evidence Rule are overruled.

Applicant submitted over 100 pages of objections, in the form of motions to strike, to statements made in opposer's witness declarations. Additionally, applicant objects to the submission of evidence from the *O'Rourke* proceeding on the ground of relevance. This latter objection is, at best, counterproductive when applicant has already stipulated to the introduction of this evidence. While the Board's decision in the *O'Rourke* case is of little value in this proceeding, the actual evidence about opposer's business and the use of its marks, also pleaded herein, is as relevant to this proceeding as if it had been introduced only in this proceeding.

We have considered each of applicant's objections, as well as opposer's responses thereto. However, as with opposer's objections, we do not burden this opinion with a discussion of the individual objections. Applicant's objections are similar to opposer's objections and are overruled for the same reasons noted above in connection with opposer's objections and for the reasons noted by

20

opposer in its response. We have considered the material and statements to which applicant objects, but accorded this evidence only the weight such matter deserves.

Regarding, in particular, applicant's objection to Mr. Caparis's qualifications as an expert, applicant provides no basis for this objection and, contrary to applicant's contention, Mr. Caparis provides detailed statements about his qualifications, which we accept.

We make a final comment with respect to the parties' objections. As previously noted with respect to the size of the record in this case, we remind the parties that the Board must review and consider each and every objection raised. The material to which the parties have objected is admissible, especially in view of the fact that the parties have agreed to submission of testimony declarations, though individual statements or documents may be of limited or no probative value. The Board is certainly capable of determining the weight to be given to the evidence and neither party helps its position by requiring the Board to use its limited resources to review numerous objections that are clearly not well taken.

*Factual Findings*

**Opposer**

21

Opposer's history began when Berry Gordy founded the Motown recording label ("Motown") in 1959 in Detroit, Michigan.[9] Detroit has been known as "Motor City" since before Berry Gordy began his business. (Moskow Discovery dep. P. 56.) In 1959, Motown had its first million-sale recording ("Shop Around" by The Miracles) and in 1961, it had its first No. 1 Pop hit recording ("Please Mr. Postman" by The Marvellettes). (Reinert para. 5/ Juste para. 4.) Between 1961 and 1971, Motown artists had more than 160 Top-20 hits. Motown artists during this period included Stevie Wonder, Marvin Gaye, Diana Ross and The Supremes, The Four Tops, The Jackson 5, The Temptations, Martha and The Vandellas, Brenda Holloway and Gladys Knight and The Pips. (Id. para. 6/5). A number of these artists continued to be prominent during the 1970's and 1980's. Motown released numerous recordings which the Recording Industry of America Association ("RIAA") has issued Gold, Platinum and Multi-Platinum awards certifications.[10]

Motown also released several movies during the 1970's ("Lady Sings the Blues," "Thank God It's Friday" and "The

---

[9] As we refer to "opposer," Motown" and "the Motown recording label" herein, we encompass the original Motown company and all of its successors.

[10] RIAA gold-certified recordings have sold at least one million singles or 500,000 albums; RIAA Platinum-certified recordings have sold at least two million singles or one million albums; and the multi-platinum award signifies multiple platinum levels of sales for singles and albums.

Wiz"). (Reinert para. 8.) In the 1980's, Motown continued its prominence in the pop music scene with artists such as Stevie Wonder, Diana Ross, Smokey Robinson, Rick James and Lionel Ritchie; and Motown music was featured in a television special and on the soundtrack for the movie "The Big Chill," which has been re-released and has sold seven million units to date (surpassing the RIAA 6x Platinum level). (Reinert/Juste Para. 9/8.)

From the 1990's to the present, Motown, through its successors in interest, has continued to release RIAA Gold, Platinum and Multi-Platinum recordings and its artists include Eryka Badu, Nelly, Akon, Lil Wayne, India.Arie and Boys II Men. (Id. Para. 10&11/9&10.) Berry Gordy and several Motown artists have been inducted into the Rock & Roll Hall of Fame.

Opposer's witnesses, Mssrs. Reinert and Juste, describe the unique "Motown Sound" that characterized the music of its early artists as follows:

> The Motown Sound was typified by a number of characteristics:  the use of tambourines to accent the back beat; prominent and often melodic electric bass guitar lines; distinctive melodies and chord structures; and a call and response singing style that was rooted in gospel music.  In addition, the Motown Sound also incorporated pop production techniques such as the use of orchestral string sections, charted horn sections, and carefully arranged background vocals.

(Para. 7/6.)

23

The evidence includes excerpts from numerous publications, as well as media coverage and articles, from the 1960's to the present, that discuss the Motown recording history and the unique Motown sound.  For example, an entry for "Berry Gordy" in *The World Book Encyclopedia* (2007) begins with the following: "Berry Gordy … founded Motown Records in Detroit.  The company recorded many top African American artists, especially those performing soul or rhythm and blues.  The popularity of the smooth and catchy 'Motown sound' brought black music into the mainstream of American popular music."  (Ortiz, Exh. 32.)

In 1995, Motown established Motown Animation, which, in 1996 produced the comic book series "The Crush."  The series features the Motown marks.  (Juste, para. 14.)

Opposer's sound and video recordings have generated very substantial sales up to the present.[11]  In addition to significant third-party media references and discussions, and books about opposer's music business, opposer continues to spend substantial sums to promote its music.  (Froeling, Para. 4-6.)

Opposer has entered into numerous license agreements, from which it collects significant revenues, for use of the

---

[11] Much of the information regarding sales and promotion by both parties is confidential and we refer to this information generally.  Suffice it to say that opposer's sales in the last five years alone surpass $100 million and its advertising surpasses $5 million for the same period.

Motown marks in connection with a wide variety of goods and services, including the following, which remain in effect unless noted otherwise:

- 1988 license to the Motown Historical Museum in Detroit, Michigan, which is dedicated to the Motown recording label and its artists and includes a gift shop that sells various items including clothing (Froeling, Para. 3-8);

- 1999 license to Motown Café Orlando, LP, in connection with a café in Orlando, Florida, which includes the sale of clothing and other items (Froeling, Para. 9);

- 2001 license to CA One Services, Inc. (subsequent change of name to Delaware North Companies Travel Hospitality Services, Inc.) to operate a Motown store at the Detroit airport, which opened in 2002, remains open, and sells a variety of Motown-themed merchandise, including mood lights, pens, pencils, harmonica key chains, music CDs, commemorative plates, balls and stuffed animals (see Czapla and Wendell dec. and Moskow discovery dep.);

- 2002 license to Late for the Sky Productions Co, Inc. in connection with a board game, Motownopoly, which was first sold in 2003 in stores such as Barnes and Noble, Transworld Entertainment and The Motown Museum Gift Shop, and was discontinued in 2005 (Schulte dec.);

25

- 2003 license to The Singing Machine Company, Inc. in connection with Karaoke machines and Karaoke CDGs (CDs with graphics), which were first sold in 2003 and sales continue in stores such as Wal-Mart, Target, Sears and K-Mart (Handal and Atkinson dec.);

- 2004 license to Konami Digital Entertainment, Inc. in connection with Karaoke Revolution Xbox video game, which was first sold in 2004 and sales continue in stores such as Target, Wal-Mart and Toys "R" Us (Rajna dec.);

- In 2004 and 2007, respectively, opposer licensed the use of its Motown marks to Hasbro, Inc. in connection with its "Hit Clips Disc Motown Pack 3" (micro music CDs) and its "ABC Jackson 5 Turbo Tooth Tunes" (toothbrushes for children). Hasbro began selling Hit Clips in 2005 and Turbo Tooth Tunes in 2007, and sales continue in stores such as Wal-Mart, Target, and Toys "R" Us (Cote dec.);

- 2007 license to Adidas in connection with clothing, headwear and footwear (Froeling, Para. 11); and

- During 2008 and 2009, unspecified licenses were planned for the recording company's 50th anniversary, including licenses in connection with music collections, anniversary apparel, television specials, a Motown satellite radio station, a Motown podcast series,

26

special-edition Motown iPod, and a special exhibit in the Rock & Roll Hall of Fame (Froeling, Para. 14).

Prices, sales and revenue figures for the licensed goods and services vary, although opposer provided no context for determining whether the reported sales are substantial for those particular goods. Opposer maintains an active and extensive enforcement program in connection with its MOTOWN marks.

In addition to the previously noted registrations that have been established in this record, opposer has established its use of the pleaded word mark MOTOWN in connection with musical recordings and performances since at least 1959. Opposer has also established its use of the pleaded design mark shown below through its licensees as noted supra:



Opposer has admitted that it is not aware of any instances of actual confusion between its use of the MOTOWN marks on any goods or services and applicant's use of the MOTOWN METAL mark on any goods (Admission no. 8); that "Motown" is a play on the term "Motor City" (Admission no. 12.); that "Motor City" is commonly understood to refer to Detroit, Michigan (Admission no. 13); and that the mark

MOTOWN MISSILE is federally registered to a third-party (Admission no. 16).[12]

The record includes numerous entries in encyclopedias and books, as well as entire books (from 1971 through 2007), about the Motown recording company, its founder Berry Gordy, the music made popular by the company, and its artists.

## Applicant

Applicant produces die cast toy cars that are sold to children and adult collectors under the brand HOT WHEELS. Applicant sells its HOT WHEELS toy cars through applicant's website and through retail stores, including Wal-Mart, Toys "R" Us, Kmart, KB Toys and drug and grocery stores. Applicant sends to retailers assortments of the HOT WHEELS toy cars and retailers may not request specific cars. (Adler, para. 9-10.) In 2006 and 2007, applicant introduced the Motown Metal line of HOT WHEELS cars. It consisted of five replica cars, namely, a 1970 Chevrolet Chevelle, a 1965 Ford Mustang, a 1970 Plymouth Road Runner, a 1967 Chevrolet Camaro, and a 1969 Pontiac GTO, each of which sold for $0.99. These cars were first shipped to retailers during the second quarter of 2006 as part of general assortments

---

[12] Opposer has requested that the Board take judicial notice of 26 web pages from various web sites. We decline to take judicial notice of web sites and we note, further, that opposer has not stated why it could not have properly introduced this evidence itself during trial. Moreover, opposer stated that this evidence was also submitted along with the trial declaration of witness Peter Caparis. Thus, we have considered this evidence only to the extent that it has been properly introduced as exhibits to Mr. Caparis's declaration.

(18 – 144 cars) of HOT WHEELS basic cars.  (Response to Opposer's Interrogatories "Resp." No. 10.)  The toy cars were sold throughout the United States.  (Supp. Resp. No. 12.)  Applicant did not use the mark MOTOWN METAL in connection with its 2008 line of HOT WHEELS toy cars. (Supp. Resp. No. 11.)  Applicant has no current plans to sell products bearing the MOTOWN METAL mark.  (Supp. Resp. No. 13.)

Additionally, during the same time period, applicant sold a collector's edition two-car set for $19.99.  The set consisted of a 1970 Ford Mustang "boss" 429 and a 1969 Chevrolet Camaro. (Adler, para. 2-4.)  This collector's edition was sold only through Kmart and applicant's toy store at its corporate headquarters.  (Bouman, para. 4.) The set is referred to by applicant as "Hot Wheels Motown Metal 40th Anniversary" and "Hot Wheels 40th Anniversary 2-Car Sets."  (Resp No. 1.)

All seven toy cars in the MOTOWN METAL line portray actual cars manufactured by either Ford, General Motors, or Chrysler, all of which are located in Detroit, Michigan. Applicant chose the mark MOTOWN METAL in November, 2005, "because of the perceived connection between Detroit, Michigan (aka 'Motown' or 'Motor City') and the United States automobile industry in general."  (Resp No. 4.)

In a least one 2006 marketing poster, the mark MOTOWN METAL is not used; rather, the toy cars are referred to as "the Muscle Cars Series." (Adler, para. 6.) Applicant describes the adult collectors of its HOT WHEELS toy cars as "very knowledgeable about cars and the automotive history." (Bouman, para. 5.)

Applicant has not entered into any license agreements with third parties for use of the mark MOTOWN METAL. (Id., para. 11.)

### Significance of the term MOTOWN

It is about this issue that the parties submitted expert testimony. Applicant's expert, Lawrence Ferrara, PhD., a musicologist, stated that "[o]n the basis of my musicological research it is my opinion that the term 'Motown' refers both to a record company and more broadly is used as a descriptive term for a musical style or genre that extends beyond the Motown record company." (Ferrara, para. 2.)

Opposer's expert offered in rebuttal the declaration of Peter Caparis, a marketing professional. Reflecting on the evidence of opposer's history, Mr. Caparis states that "Motown has been used as both the name of the Motown Record Corporation and the successors thereto, and a trademark for Motown products" (Id., para. 5); and that, to the extent that there is a "Motown style" of music, "that simply

evidences the strength of the Motown mark" and "does not denigrate, but rather strengthens its trademark and branding significance" (Id., para. 8). Mr. Caparis also states that, to the extent Detroit may be referred to as "Motown," this nickname is derived directly from its heritage as the origin of the Motown recording company and the "Motown sound." (Id., para. 9.)

The record clearly establishes that the word MOTOWN was created by opposer's predecessor's founder, Berry Gordy, as a mark identifying its music recording company; and that it became and remains strongly associated with the successor recording companies, recordings and entertainment by artists connected therewith, and with the particular style of music connected with that recording label by, at least, its early artists. Mr. Gordy has publicly stated that he chose the mark MOTOWN because it suggested "Motor City," the long-time nickname for Detroit, which has been the center of the U. S. automotive industry, and because Detroit is Mr. Gordy's hometown and the town in which his recording company began and was located for many years.

The record shows that "Motown" is also a style of music, which is described herein. However, we do not agree that applicant has established that this term is generally understood to describe a style reflected in the music of non-Motown artists. Applicant and Mr. Ferrara primarily

31

rely on an excerpt from a young person's book referring to Aretha Franklin as a Motown star and an article referring to Tina Turner as a Motown singer. These two references could be a mistake and, in any event, are insufficient to establish the public's understanding of the source of this style of music.

Additionally, the record establishes that, at least since 2003, the media has referred to Detroit as Motown; and that there are currently businesses local to the Detroit area that incorporate the term Motown into their names. Additionally, dictionary definitions in the record, all of which are subsequent to Mr. Gordy's use of the mark MOTOWN in connection with his recording company, define Motown as opposer's recording company, the style of music described herein, **and** the city of Detroit.

*Analysis*

### *Standing*

Opposer has established its standing to oppose registration of the involved application. In particular, opposer has properly made its pleaded registrations of record (*see infra*) and, further, has shown that it is not a mere intermeddler. Opposer's use and registration of its marks establish that opposer has standing. *See Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842 (Fed. Cir. 2000); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023

(Fed. Cir. 1999); and *Lipton Industries, Inc. v. Ralston Purina Co*., 670 F.2d 1024, 213 USPQ 185 (CCPA 1982).

***Priority***

In view of opposer's ownership of valid and subsisting registrations, there is no issue regarding opposer's priority with respect to those registered marks and the goods and services identified therein. *King Candy, Inc. v. Eunice King's Kitchen, Inc*., 496 F.2d 1400, 182 USPQ 108 (CCPA 1974).

Opposer also established use of its word mark MOTOWN in connection with musical and video recordings and, along with the design mark shown below, in connection with a wide variety of licensed products, as described supra, since long before applicant's filing date of its intent to use application and long prior to any dates of actual use of its mark shown herein. Opposer pleaded and established its use of its MOTOWN mark and the design mark shown below in connection with board games and Karaoke, both of which were first identified by the noted MOTOWN word and design mark in 2003, which is prior to the filing date of the subject application and prior to any dates of actual use of applicant's mark shown herein.



## *Likelihood of Confusion*

Our determination of likelihood of confusion under Section 2(d) must be based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the likelihood of confusion issue. *In re E.I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689 (Fed. Cir. 2005); *In re Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201 (Fed. Cir. 2003); and *In re Dixie Restaurants Inc.*, 105 F.3d 1405, 41 USPQ2d 1531 (Fed. Cir. 1997). Opposer must establish that there is a likelihood of confusion by a preponderance of the evidence.

In considering the evidence of record on these factors, we keep in mind that "[t]he fundamental inquiry mandated by Section 2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks." *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976). *See also In re Azteca Restaurant Enterprises, Inc.,* 50 USPQ2d 1209

(TTAB 1999) and the cases cited therein.  The relevant *du Pont* factors in the proceeding now before us are discussed below.

## *The Parties' Positions*

Opposer contends that its mark is famous, touting its long use of its MOTOWN marks in connection with its music recordings and entertainment services, its substantial advertising and sales revenue, and its extensive licensing program across a wide variety of goods and services. Opposer contends that the MOTOWN mark is so famous in connection with its recording company, and in connection with its licensing program across a diverse variety of goods and services, that the MOTOWN mark is "an iconic brand in American culture." (Brief, p. 12.)

Opposer also contends that the identical term MOTOWN in applicant's mark, MOTOWN METAL, is dominant because METAL is merely descriptive of applicant's metal toy cars; and, therefore, the marks are substantially similar.  Opposer acknowledges that it does not sell goods identical to those in the application, but asserts that applicant's goods are competitive with opposer's music-related goods and its licensed goods; and that, at a minimum opposer's licensed goods move through the same trade channels to the same or overlapping classes of purchasers as applicant's goods,

35

noting that purchasers of both parties' relatively inexpensive goods are likely to be impulse purchasers.

Applicant contends that opposer cannot claim exclusive rights to Motown because the term has several meanings, the "first and foremost" (brief, p. 2) of which is allegedly to identify the city of Detroit; second, Motown allegedly identifies a genre of popular music; and third, applicant concedes that Motown identifies the recording company founded by Gordy Berry and currently owned by opposer.

Applicant contends that opposer's MOTOWN mark is merely descriptive of a genre of music; that the term is not inherently distinctive and opposer has not shown that MOTOWN has acquired distinctiveness; and that, even if opposer's mark has acquired distinctiveness, it is only in connection with music-related goods, not toys or toy vehicles.

Applicant argues that opposer's mark MOTOWN is primarily geographically descriptive because opposer's goods and services originated in Detroit and are still associated with Detroit and, thus, a goods/place association exists. Applicant notes that Berry Gordy chose the name Motown for his recording company precisely because it evokes Detroit, and, thus, the geographic significance of the term arose at the same time the mark was created. Applicant argues, further, that even if the geographic significance of MOTOWN post-dates its use as a mark, it is now so associated.

36

Applicant asserts that any strength or fame of opposer's MOTOWN mark is limited to the music market, noting third-party uses of Motown, particularly as a nickname for Detroit, as shown in the record. Applicant contends that the marks are dissimilar because MOTOWN as used in applicant's mark, MOTOWN METAL, refers to the city of Detroit and METAL is equally dominant because it suggests strength. Applicant also refers to the evidence indicating that Motown means a style or genre of music. Applicant alleges that, based on the context in which the word Motown appears in applicant's mark, purchasers will correctly discern the word's meaning and, thus, the marks have substantially different connotations.

Applicant contends that opposer has not established that it uses its mark in connection with any toys, alleging that opposer's licensed goods are merely souvenirs and novelty items, and, therefore, the parties' goods differ. Applicant states that, while clothing may be a collateral product to opposer's music business, toy cars would not be perceived as collateral products to musical recordings and entertainment. Moreover, applicant contends that the children and adult collectors who purchase its toy cars are discerning, not impulse, purchasers.

In reply to applicant's arguments, opposer states that Berry Gordy coined the term MOTOWN, which is inherently

37

distinctive, and it is because of opposer's fame that Detroit was subsequently nicknamed Motown.  Opposer contends that even if MOTOWN may have come to signify a style of music, Berry Gordy was the source of that style, which reinforces the fame and recognition of opposer's MOTOWN marks.

Opposer also notes that, because its registrations are more than five years old, applicant is barred from challenging the validity of the registered marks on the ground of descriptiveness.  Opposer asserts that it has never used its MOTOWN marks to refer to Detroit; however, applicant's allegation that Motown is primarily geographically descriptive as it pertains to the city of Detroit undercuts the registrability of applicant's own mark.

<em>Fame</em>

As our primary reviewing Court has made clear, fame of the prior mark plays a dominant role in cases featuring a famous or strong mark.  "Famous or strong marks enjoy a wide latitude of legal protection" and a famous mark "casts a long shadow which competitors must avoid."  *Kenner Parker Toys, Inc. v. Rose Art Industries, Inc.*, 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992).  See also *Bose Corp. v. QSC Audio Products Inc.*, 293 F.3d 1367, 63 USPQ2d 1303 (Fed. Cir. 2002); and *Recot Inc. v. M.C. Becton*, 214 F.3d 1322, 54

USPQ2d 1894 (Fed. Cir. 2000). Therefore, we consider this factor first.

Fame for likelihood of confusion purposes arises "as long as a significant portion of the relevant consuming public...recognizes the mark as a source indicator." *Palm Bay Imports, Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). Given the nature of opposer's goods and services, the relevant consuming public herein comprises the general public.

Fame may be measured indirectly by the volume of sales and advertising expenditures of the goods and services at issue, by the length of time the mark has been in use, widespread critical assessments and notice by independent sources of the goods and services identified by the mark as well as the general reputation of the goods and services. *Bose Corp. v. Audio Products Inc.*, *supra*.

In view of applicant's aforementioned arguments, we consider, first, the strength of opposer's MOTOWN mark on the spectrum of distinctiveness. While applicant may not assert such a defense against incontestable registrations or, in any event, in the absence of a counterclaim, we address the degree of distinctiveness of opposer's MOTOWN mark because this is factored into our consideration of fame. The record clearly establishes that opposer's

39

founder, Berry Gordy, coined the term MOTOWN as a trademark for its musical recording and entertainment services. The fact that he may have been inspired by the Detroit nickname, Motor City, does not render the mark merely descriptive. In connection with the music-related goods and services involved, the mark at its creation was arbitrary and inherently distinctive.

From the point of its creation on, the mark MOTOWN only became stronger in view of the established fact that Mr. Gordy and his company forged a new popular music style that, due to the name of the company, became known as the Motown sound. Opposer acknowledges and describes a style of music that is consistent across the recordings of its artists, particularly in the early decades. This style and many of opposer's early artists have remained popular to the present, so popular that our record includes excerpts from many articles and books about the various artists, Mr. Gordy, and Motown Records. On this record, while Motown is clearly a very popular style of music, it remains a style of music strongly and primarily associated with opposer.

Opposer's sales and advertising from the 1960's to the present are extensive, the established popularity of the recording label and its artists, and the substantial third-party articles and books about Mr. Gordy, the Motown label and its artists leads us to conclude that the MOTOWN mark is

40

very famous in connection with musical recordings and musical entertainment. We find that the mark is not famous in connection with the various goods in connection with which the mark is licensed and used except as such use refers to opposer's primary music goods and services. However, a famous mark such as Motown can be expected to cast a long shadow and to be used in connection with numerous collateral goods, i.e., consumers would expect certain non-music-related items containing the Motown brand to be sponsored by opposer.

Before turning to consider the relationship, if any, between opposer's goods and services and the goods identified in the application, we address applicant's argument that Motown is primarily geographically descriptive. Mr. Gordy began his Motown recording company in Detroit and it was in this city that the Motown recording label and Motown sound became popular. Detroit developed and retains a reputation as the home of the famous Motown music label and sound, even though opposer is now located in California. Applicant has shown us evidence that, at least since 2003, sports media and other news media have used the term Motown as a nickname to refer to Detroit; and that several non-music-related businesses in Detroit and the surrounding area use Motown in their names, presumably to reflect their association with Detroit.

41

A non-geographic designation originally used as a trademark is not "primarily" geographically descriptive if it becomes, only later, attached to a specific geographic location. See *In re Pebble Beach Co.*, 19 USPQ2d 1687 (TTAB 1991). Opposer has established that its famous mark MOTOWN, in use for approximately 50 years, is associated closely with opposer so that it functions primarily as a mark and it is not primarily geographically descriptive. Indeed, it is entirely through opposer's (and its predecessor's) efforts that the Motown recording label and sound became and remain famous and that opposer's origin and tenure in Detroit became widely known such that consumers associate Detroit with opposer and have given Detroit the nickname of Motown. Moreover, the uses by the media of Motown to refer to Detroit are non-commercial uses. "A trademark owner does not have the right to control public discourse whenever the public imbues his mark with a meaning beyond its source-identifying function." *Mattel Inc. v. MCA Records Inc.*, 296 F.3d 894, 63 USPQ2d 1715, 1718 (9th Cir. 2002).

Regarding the third-party uses of Motown in local Detroit business/organization names, as opposer has noted, a number of the uses appear to be informal, difficult to monitor groups, such as a local Harley Davidson club. Opposer has shown that it has an active and extensive trademark enforcement program in connection with its MOTOWN

marks and opposer states that to the extent it was aware of any of these uses, it considers them insignificant and/or non-competing. Applicant has not established or argued otherwise. We agree that these third-party uses do not diminish the strength or fame of opposer's mark MOTOWN or render it primarily geographically descriptive.[13]

### The Goods and Services

It is well established that the goods and/or services of the parties need not be similar or competitive, or even offered through the same channels of trade, to support a holding of likelihood of confusion. It is sufficient that the respective goods and/or services of the parties are related in some manner, and/or that the conditions and activities surrounding the marketing of the goods and/or services are such that they would or could be encountered by the same persons under circumstances that could, because of the similarity of the marks, give rise to the mistaken belief that they originate from the same source. *See Hilson Research, Inc. v. Society for Human Resource Management*, 27 USPQ2d 1423 (TTAB 1993); and *In re International Telephone & Telegraph Corp.*, 197 USPQ 910, 911 (TTAB 1978). The issue, of course, is not whether purchasers would confuse the goods

---

[13] Similarly, we do not consider the one third-party registration for a mark that contains the word Motown to warrant a different result. This registration is not evidence of use, the goods are different from those involved herein, and the Board is not responsible for the registrability decisions of Trademark Examining Attorneys.

and/or services, but rather whether there is a likelihood of confusion as to the source of the goods and/or services. *In re Rexel Inc*., 223 USPQ 830 (TTAB 1984). The question of likelihood of confusion must be determined based on an analysis of the goods and/or services recited in applicant's application vis-à-vis the goods and/or services identified in opposer's pleaded registration(s). *Canadian Imperial Bank v. Wells Fargo Bank*, 811 F.2d 1490, 1 USPQ2d 1783 (Fed. Cir. 1992.

Opposer has registered the mark MOTOWN, as a word mark and with design features, for musical recordings and entertainment services, restaurant services, and retail gift store services featuring music, clothing, reading material and souvenirs. In addition to demonstrating use of its MOTOWN marks in connection with these goods and services, opposer has also shown use of its mark through licensees in connection with museum services, board games, Karaoke machines, an X-Box Karaoke video game, movies, music collections, and musical toothbrushes. Through its retail stores, opposer has shown use of its mark on MOTOWN-branded items including clothing, mood lights, pens, pencils, harmonica key chains, music CDs, commemorative plates, balls and stuffed animals.

There is no question that these goods and services are not the same as applicant's toy vehicles and accessories for

44

toy vehicles.  Applicant argues that opposer's goods do not fall within the category of "toys, games and playthings," whereas its identified goods do.  However, whether opposer's collateral goods are characterized generally as "toys" or "playthings" is immaterial.  The correct test is whether applicant's goods are such that a prospective purchaser would expect applicant's goods to be made or sponsored by opposer if identified by confusingly similar marks.  Obviously, opposer's primary business involves musical recordings and entertainment services.  However, opposer has demonstrated that in connection with its music and entertainment business, it has licensed the use of its MOTOWN marks in connection with a wide range of goods and services, from restaurant services to pens, commemorative plates and stuffed animals.  It requires no stretch of the imagination for consumers to believe that these varied collateral goods could reasonably include toy cars.  Thus, particularly in view of the fame of opposer's MOTOWN marks in connection with its music and entertainment services, we find that applicant's "toy vehicles" are sufficiently related to, and reasonably within the scope of, opposer's MOTOWN-branded collateral goods and are likely items in opposer's MOTOWN-branded retail store and museum gift shop, that confusion as to source is likely if identified by substantially similar marks.

45

*Trade Channels, Purchasers and Conditions of Sale*

First, there is no question that the relevant consumer for opposer's goods and services and applicant's goods is the general public. Applicant identifies the target consumer for its toy vehicles as children and adult collectors; however, its identification of goods is not so limited. As such, all types of ordinary consumers are encompassed within the relevant class of consumers for the parties' goods, including those who may be more or less knowledgeable about the parties' goods, services and marks.

The prices of the parties' respective goods and services are not high and, thus, we find that the relevant purchasers, i.e., the general public, would use nothing more than ordinary care in making their purchasing decisions.

*The Marks*

With respect to the involved marks, we examine the similarities and dissimilarities of the marks in their appearance, sound, meaning, and commercial impression. *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 73 USPQ2d at 1692. The test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in their entireties that confusion as to the source of the services offered under the respective marks is likely to result. The focus is on the recollection of the average

46

purchaser, who normally retains a general rather than a specific impression of trademarks. *Sealed Air Corp. v. Scott Paper Co.*, 190 USPQ 106 (TTAB 1975). We are guided, equally, by the well established principle that, in articulating reasons for reaching a conclusion on the issue of confusion, "there is nothing improper in stating that, for rational reasons, more or less weight has been given to a particular feature of a mark, provided the ultimate conclusion rests on consideration of the marks in their entireties." *In re National Data Corp.,* 732 F.2d 1056, 224 USPQ 749, 751 (Fed. Cir. 1985).

Further, as the fame of a mark increases, as in the case of opposer's MOTOWN marks, the degree of similarity between the marks necessary to support a conclusion of likely confusion declines. *Bose Corp. v. QSC Audio Products Inc.*, 63 USPQ2d at 1309.

Opposer has established its ownership of registered marks for the word MOTOWN, as well as for MOTOWN MUSIC REVIEW and MOTOWN with several designs:

   

In each mark, MOTOWN is the dominant portion of the mark. The "M" in the first design mark above merely reinforces the first letter in MOTOWN, and the font and square border are

insignificant. In the second mark, MOTOWN is centered in what is merely a carrier design of little significance. In the third mark, the script in which the word MOTOWN appears is insignificant. In the fourth mark, the circle is merely a carrier for the wording; MASTER SERIES (SERIES is disclaimed) is highly suggestive in connection with the identified goods, musical sound recordings; and the word MOTOWN appears in dark bold letters as the first word above MASTER SERIES. The registration for the word mark MOTOWN MUSICAL REVIEW for retail gift store services includes a disclaimer of "Music." MUSIC REVIEW is suggestive of the identified services to the extent that retail gift store services encompasses music-related gift items. Moreover, the word MOTOWN appears first in the mark, and the first word in a mark is often perceived as most prominent. Also, in view of the fame of the MOTOWN mark in the music field, the words that follow in the mark, MUSIC REVIEW, are likely to be seen as modifying or referring to MOTOWN, even in connection with retail gift store services, which encompasses music-related gift items. Therefore, we find MOTOWN to be dominant in this mark also.

Comparing these marks to applicant's mark, opposer's MOTOWN word mark is identical in sound and appearance to the first word in applicant's mark MOTOWN METAL. Opposer's other marks are similar in sound and appearance to

48

applicant's mark to the extent that they all include the dominant word MOTOWN.

Regarding the connotation of applicant's mark, the second word in the mark, METAL, merely describes a significant feature of applicant's toy vehicles, i.e., that they are made of metal. The individual words, MOTOWN and METAL are alliterative, however, the two words together have no connotation that differs from the meanings of the individual words. Applicant's witnesses have testified to applicant's intention to suggest, as applied to its toy vehicles, the city of Detroit and the idea of strength. However, we must look to the likely consumer perception of the mark in connection with the identified goods, rather than applicant's intended connotation. There is no evidence in the record that METAL, alone or in combination with MOTOWN, will connote strength or the strength of a car or a city, or the strength of the city of Detroit, or anything other than the composition of the identified toy vehicles. Applicant's witnesses have testified to the significance of the auto industry to the city of Detroit, and it is possible that, to some consumers, one connotation of MOTOWN in applicant's mark in connection with toy vehicles will be the auto industry in Detroit. However, we also consider the extent of the fame of opposer's mark MOTOWN in the music business and opposer's strong connection to the city of

49

Detroit such that the city nickname, Motown, is a direct result of the success of opposer's music business and the fame of its MOTOWN mark; and opposer's actual use of this mark on a wide variety of collateral goods and services, which we have already found could include toy vehicles. As such, we find that the principle connotation of MOTOWN will be as a reference to opposer, whether or not it also conjures up the city of Detroit; and this connotation is not diminished or changed by the addition of the highly suggestive, if not merely descriptive, term METAL to the mark. Similarly, the commercial impression of the mark as a whole, in connection with the identified goods, is metal toy vehicles sponsored by opposer.

Particularly in view of the fame of opposer's MOTOWN marks in the music business, we conclude that applicant's mark MOTOWN METAL is substantially similar to opposer's word mark MOTOWN, and significantly more similar than dissimilar to opposer's other MOTOWN marks. We are not convinced otherwise by applicant's arguments to the contrary, including its argument that it will always use MOTOWN METAL in conjunction with its "well known" HOT WHEELS mark, which is irrelevant because it is not part of the mark involved herein.

*Conclusion on Likelihood of Confusion*

We find that the *du Pont* factors, on balance, weigh in favor of a finding of likelihood of confusion.

We conclude that consumers familiar with the goods and services sold under opposer's famous MOTOWN marks, would be likely to believe, upon encountering applicant's mark MOTOWN METAL for toy vehicles and accessories, that the goods and services originate from or are associated with or sponsored by the same entity.

### *Dilution*

We turn now to consider opposer's claim that applicant's mark will dilute its famous MOTOWN mark by blurring its distinctiveness. Pursuant to the Trademark Dilution Revision Act of 2006 ("TDRA"), Section and 43(c) of the Trademark Act of 1946, 15 U.S.C. § 1125(c), provides as follows:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury.

Section 43(c)(2)(B) of the Trademark Act, 15 U.S.C. §1125(c)(2)(B), defines dilution by blurring as follows:

> "[D]ilution by blurring" is association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark.

51

In deciding opposer's dilution claim, we consider three factors: "(1) whether the opposer's mark is famous; (2) whether the opposer's mark became famous prior to the date of the application to register the applicant's mark; and (3) whether the applicant's mark is likely to blur the distinctiveness of the opposer's famous mark." *National Pork Board v. Supreme Lobster and Seafood Co.*, 96 USPQ2d 1479, 1494-5 (TTAB 2010). *See also Coach Services Inc. v. Triumph Learning LLC,* 96 USPQ2d 1600 (TTAB 2010).

*Fame of Opposer's MOTOWN mark*

We have found opposer's mark is famous in connection with musical recordings and musical entertainment for purposes of likelihood of confusion. However, opposer has the burden of a "higher and more rigorous standard for dilution fame." *Palm Bay Imports Inc. v. Veuve Clicquot Ponsardin Maison Fondee En 1772*, 396 F.3d 1369, 73 USPQ2d 1689, 1694 (Fed. Cir. 2005). See also *Toro Co. v. ToroHead Inc.,* 61 USPQ2d 1164, 1170 (TTAB 2001).

A mark is defined under §1125(c)(2)(A) as "famous" for dilution purposes —

> … if it is widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the mark's owner. In determining whether a mark possesses the requisite degree of recognition, the court may consider all relevant factors, including the following:
>
> (i) The duration, extent, and geographic reach of advertising and publicity of the mark, whether

52

advertised or publicized by the owner or third parties.

(ii) The amount, volume, and geographic extent of sales of goods or services offered under the mark.

(iii) The extent of actual recognition of the mark.

(iv) Whether the mark was registered under the Act of March 3, 1881, or the Act of February 20, 1905, or on the principal register.

Opposer's MOTOWN mark has been registered and in use in connection with its music recordings and entertainment services for almost 50 years.

Opposer has demonstrated extensive nationwide sales of its music recordings, as well as numerous concerts and television appearances featuring its music and artists. This is evidenced in the confidential materials of record and manifest in the number of RIAA awards for significant numbers of recordings sold.

Opposer has demonstrated extensive nationwide promotion of its mark for musical recordings and entertainment through traditional advertising media and through sales of its collateral goods and services, including a MOTOWN retail gift store, a MOTOWN museum and a café. Additionally, opposer's MOTOWN music recordings and entertainment services receive substantial third-party publicity including, at least, media coverage, dictionary and encyclopedia entries, and books and articles about opposer's founder, opposer's recording business and its artists, and the nature of its

53

music.  From this third-party publicity, it is also clear that opposer is well known for introducing, in the early 1960's, a new style of popular music that, in fact, became wildly popular and remains popular today.  The New York Times, September 5, 2009 (Caparis Exh. 5), wrote that MOTOWN is "synonymous with the musical, social and cultural fabric of America."  The popularity of opposer's recording label and artists and the particular style of music, along with opposer's long-time association with the city of Detroit, has resulted in Detroit garnering the nickname "Motown" in addition to its nickname "Motor City."  Clearly, exposure of the general public to opposer's MOTOWN mark is extensive; opposer's MOTOWN music recordings and entertainment have long been a stalwart of popular culture in the United States; and opposer's mark clearly has a national presence. While the record contains no surveys or other evidence specifically measuring the general public's "actual recognition" of opposer's MOTOWN marks, we find the evidence of public exposure is so strong that we infer from this significant actual recognition among the general public as well.

Taking into account the non-exhaustive factors enumerated above, we find that opposer has established that its trademark MOTOWN is famous for dilution purposes.

54

Moreover, this fame attached to opposer's MOTOWN mark as early as the 1960's and it remains equally famous today. Opposer's MOTOWN mark became famous long prior to any date upon which applicant may rely, i.e., the filing date of applicant's intent-to-use application on November 11, 2005. See *Citigroup Inc. v. Capital City Bank Group Inc.*, 94 USPQ2d 1645, 1650, fn. 13 (TTAB 2010), *aff'd Citigroup Inc. v. Capital City Bank Group Inc.,* 98 USPQ2d 1253 (Fed. Cir. 2011) (Intent-to-use applicant asserting any use prior to its filing date is required to plead such use as an affirmative defense to dilution claim). Applicant's arguments that the fame of opposer's MOTOWN mark is limited to a niche market is not well taken, as opposer's fame is obviously not limited to a geographic region, a segment of an industry or service, or a particular channel of trade. *Toro Co. v. ToroHead Inc*., 61 USPQ2d 1164, 1179 (TTAB 2001).

Having determined that opposer's mark MOTOWN has the requisite fame, we turn to the question of "whether there is a likelihood of dilution by blurring, that is, whether the association arising from the similarity of the parties' marks impairs the distinctiveness of opposer's famous mark under Trademark Act §43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B). We must determine not only whether there is an 'association' arising from the similarity of the marks, but whether such association is likely to 'impair' the distinctiveness of the

55

famous mark." *Nike Inc. v. Maher*, __ USPQ2d __ (Opposition No. 91188789, TTAB August 9, 2011).

Dilution by blurring occurs when a substantial percentage of consumers, upon seeing the junior party's use of a mark on its goods are immediately reminded of the famous mark and associate the junior party's use with the owner of the famous mark, even if they do not believe that the goods come from the famous mark's owner. *Toro Co. v. ToroHead Inc., supra.* In determining whether a mark is likely to cause dilution by blurring, the court may consider the following six non-exhaustive factors:

1. The degree of similarity between the mark or trade name and the famous mark.

2. The degree of inherent or acquired distinctiveness of the famous mark.

3. The extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark.

4. The degree of recognition of the famous mark.

5. Whether the user of the mark or trade name intended to create an association with the famous mark.

6. Any actual association between the mark or trade name and the famous mark.

15 U.S.C. §1125(c)(2)(B)(i)-(vi).

***The degree of similarity between the mark and the famous mark.***

Under the 2006 TDRA amending Section 43(c) of the Trademark Act, the previously enunciated standard requiring "substantial similarity" between the famous mark and the mark at issue is no longer the standard for dilution by

blurring; rather, the amended statutory language refers only to "degree of similarity...." *Nike, supra.* *See Levi Strauss & Co. v. Abercrombie & Fitch Trading Co.,* 633 F.3d 1158, 1171, 97 USPQ2d 1947, 1958 (9th Cir. 2011). *See also, Starbucks Corp. v. Wolfe's Borough Coffee, Inc.,* 588 F.3d 97, 92 USPQ2d 1769 (2d Cir. 2009) ("Although 'similarity' is an integral element in the definition of 'blurring,' we find it significant that the federal dilution statute does not use the words 'very' or 'substantial' in connection with the similarity factor to be considered in examining a federal dilution claim.") and *Tiffany (NJ) Inc. v. eBay, Inc.,* 600 F.3d 93, 111 n.18, 94 USPQ2d 1188, 1201 n.18 (2d Cir. 2010) ("We have recently explained that under the [TDRA] the similarity between the famous mark and the allegedly blurring mark need not be 'substantial' in order for the dilution by blurring claim to succeed.")

The question before us in this regard is "whether the two involved marks are sufficiently similar to trigger consumers to conjure up a famous mark when confronted with the second mark." *National Pork Board*, 96 USPQ2d at 1497. We are not conducting a likelihood of confusion analysis under Section 2(d); however, we still consider the marks in terms of the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *Coach Services*, 96 USPQ2d at 1613.

In connection with our Section 2(d) analysis, we have already found that, when used in connection with their respective goods and services, applicant's MOTOWN METAL mark is substantially similar to opposer's MOTOWN mark such that consumer confusion is likely. In view of the similarities between the marks noted in that analysis, and the extensive fame of opposer's MOTOWN mark, we find that the marks are sufficiently similar that applicant's mark will "trigger consumers to conjure up" opposer's famous mark. Id. As such, consumers encountering applicant's mark will be immediately reminded of opposer's famous MOTOWN mark and associate the two marks.

### *Degree of inherent or acquired distinctiveness of the famous mark*

In our consideration of the fame of opposer's MOTOWN mark in our likelihood of confusion analysis, we discussed the distinctiveness of opposer's mark and concluded that it is an arbitrary term that is inherently distinctive. We also concluded that, through opposer's use of the mark in connection with its recording label, MOTOWN has come to describe a style of music found in the music of opposer's early recording artists, and that all but several insignificant uses of a MOTOWN style of music refer to opposer and its recording artists.

58

Similarly, the distinctiveness of opposer's MOTOWN mark is not diminished in any way by the facts, found above, that the media and others nicknamed the city of Detroit MOTOWN precisely because of the fame of opposer's mark and opposer's connection to Detroit. Moreover, the use by the media and most others of MOTOWN to refer to Detroit is non-commercial use and, as such, does not effect the distinctiveness of the mark. The use of MOTOWN to refer to a style of music primarily associated with opposer's recording artists, also reflects back directly to opposer's MOTOWN music business and does not diminish the inherent distinctiveness of opposer's MOTOWN mark.

### *Extent to which use of the famous mark by owner is substantially exclusive*

For the reasons discussed immediately above and in connection with our likelihood of confusion analysis, opposer's substantially exclusive use of its MOTOWN mark is not diminished by the noted non-commercial uses of the term. There is also evidence of third-party use of MOTOWN in marks or trade names identifying organizations and businesses, presumably to indicate their location in or near Detroit.

We agreed, above, with opposer that such uses are insignificant. Moreover, opposer has established that it has a strong and active program to enforce its MOTOWN trademark rights. Thus, while opposer's use of the MOTOWN

59

mark is not entirely exclusive, it is substantially exclusive.

### *Degree of recognition of the famous mark*

As discussed above, the record establishes extensive third-party media coverage, dictionary and encyclopedia entries, and books devoted to opposer and its founder and history, the Motown sound, and opposer's recording artists. Opposer's music recordings reflect a style of popular music that is widely available on opposer's extensive recordings and heard in its music entertainment.  We find the extent of recognition of opposer's famous mark is substantial.  This is further evidenced by the nickname "Motown" bestowed by the media and the public on the city of Detroit.

### *Whether applicant intended to create an association with the famous mark*

In the record, applicant's witnesses declared that applicant's intent in choosing the mark MOTOWN METAL was to suggest strength and a connection with Detroit as a center of the auto industry in the United States.  Applicant's witnesses acknowledged their prior knowledge of opposer and its MOTOWN marks as used in connection with music recordings, but there is no evidence that applicant intended to create an association with opposer's famous MOTOWN mark.

### *Any actual association between applicant's mark and the famous mark*

The opposed application is based on a bona fide intention to use the mark in commerce, and no allegation of use has been filed in the application.  On its face, there is no opportunity for an actual association between applicant's mark and the famous mark to have occurred.  In this case, applicant has submitted evidence that it actually used the mark in commerce for approximately two years, but neither party has submitted any evidence of an actual association between the marks based on this limited use.

### *Balancing the factors*

Considering the evidence of record and the parties' arguments, we balance the factors in opposer's favor.  Opposer's mark is inherently distinctive; the marks are sufficiently similar that an association between them is established; the degree of public recognition of opposer's MOTOWN mark is very high; and opposer engages in substantially exclusive use of its mark.  Because the application herein is based on a bona fide intention to use its mark and applicant actually used its mark for only two years, there is no actual association shown between the marks, nor is there evidence of a bad faith intent in applicant's adoption of its mark.  However, these latter two factors do not outweigh the other dilution factors noted herein.

61

In conclusion, we find that applicant's mark is likely to dilute opposer's mark under Trademark Act § 43(c)(2)(B), 15 U.S.C. § 1125(c)(2)(B). Opposer has shown on this record that its mark is famous, that it became famous prior to the filing date of applicants' application for their mark, and that an association exists between the parties' marks that would impair the distinctiveness of opposer's famous mark.

*Decision*: The opposition is sustained on the grounds of likelihood of confusion and dilution, and registration to applicant is refused.